Our final case this morning will be Tear Drop Cattle Company v. Devon Energy Production, number 24-8001. Counsel, you may proceed. Thank you, Your Honor. And may it please the court, let me be the first to wish you a good afternoon. My name is Clay Gregerson and along with Jeff Oven at counsel table, we represent Devon Energy Production Company. It's my intent to reserve about three minutes for rebuttal today. This case pertains to various agreements regarding the use of lands owned by Tear Drop Cattle Company and the use related to oil and gas operations and that require payment for that use. Devon assigned those agreements in 2016 to two related entities, Mariah Powder River and Carbon Creek Energy. For years after that assignment, Mariah and Carbon Creek worked with Tear Drop exclusively and without Devon. They reclaimed, they made payments, they followed the agreements. But in 2019, those payments stopped. And it was only after Mariah filed for bankruptcy that Tear Drop demanded that Devon remit payment and this litigation followed. We're here today asking the court to reverse the district court's orders, first, granting Devon's motion to dismiss on mootness or alternatively, the district court's summary judgment orders, finding Devon remained liable under those agreements after its assignment. The first issue the court needs to address is jurisdictional and whether this case should be here in the first place. In the fall of 2022... Well, let me ask you on that question. This goes to whether the counterclaim should be moot. Yes, Your Honor. Correct. And Devon moved to dismiss, well, to dismiss as moot, but moved to dismiss the counterclaim as moot. So if this is a close issue, not saying it is or isn't, but let's assume it is, does that mean that Devon has the burden to show mootness because it was the moving party on the issue? I believe as the moving party, yes, it would be Devon's burden to show mootness. Okay. And I believe that Devon did. In this case, years into the litigation and in the fall of 2022, Mariah paid teardrop everything. They didn't just pay teardrop the amounts teardrop was claiming in this litigation. They didn't just pay teardrop the amounts that it accrued since this litigation started up to that point. They also paid teardrop all of its claims for interest on those payments. They paid teardrop all of its claims, potential claims for penalties based on those payments being late. And it paid all of teardrop's attorney's fees incurred in this litigation. At that point in time, there was nothing under the agreements that was in dispute. Teardrop couldn't bring a claim under these agreements because there was nothing to bring a claim on. Teardrop couldn't make a demand based on these agreements because there was nothing to demand. Does that line up with the fact that, didn't Teardrop sue Devon again in 2022 for delinquent payments? It did. And that case was dismissed because of the payment that Carbon Creek and Pinline made. All right. But it happened again. It did. Okay. And isn't it at least reasonably likely that the assignees might fail to make their payments again, given that they're still in bankruptcy? It may be, but that's not the relevant inquiry. The relevant inquiry isn't about whether it might happen in the future. Well, why isn't it the relevant inquiry? If it's likely or reasonably likely to happen, why would it be moot? Because the standard is whether or not under mootness, there are direct real world impacts and the change in the party's behavior that will result from a decision from the court. At that point in time, and upon curing all defaults and making good on all obligations under the agreements, there was nothing that a decision from the court would have required to happen, would have changed in the party's behavior. Counselor, can I ask you though, you invited this inquiry by filing a counterclaim for declaratory judgment, which is necessarily asking the court to determine your rights so that the parties would then know how to proceed in the future. And so one concern I have is, as I was reviewing the record, it seems as if Devon has argued about the declaratory judgment statute in Wyoming before the Wyoming Supreme Court, but also within this case and saying that it should be construed very broadly. And in fact, at one point before the district court here, I believe in an opposition to summary judgment, essentially making an argument that differs maybe even 180 degrees from the one you're making now and saying it's moot. So my concern is about judicial estoppel. And why shouldn't we attribute Devon's prior arguments about how to construe this statute in this case and in other cases, which seems to me to be opposite of what you're arguing today? I don't believe it's inconsistent, Your Honor. When we made those arguments, and frankly, I do, the Wyoming Declaratory Judgment Act is a very broad act, but it still requires a live case and controversy. It still requires some change in behavior from a decision from the court. Now, when we made the argument about this case being broader, that was after summary judgment, the first summary judgment order had been issued in Tearjobs' favor as to just Tearjobs' claims. When the district court, after that order, basically said the case is done and we said, hey, hold on a second. The case isn't done. There's other claims between us and third parties, and there's also our declaratory judgment action. The important distinction at that point in time was that there were payments outside of what Teardrop was claiming in this case that had become due. And the payments that Teardrop was claiming hadn't been paid. So there was still that outstanding obligation under these agreements that hadn't been fulfilled. That's what gave it the live case and controversy. That's what gave it a decision from this court impact. Well, you didn't specify that, though, in this pleading opposing summary judgment. You just simply argued that Teardrop's claims didn't address the broader question in the counterclaim involving successive and future payments, whether Devon could be held liable for those obligations and amounts, or Devon's ability to terminate or stop access under the agreement. You yourself characterized this as a very, very broad counterclaim. We did, Your Honor, and because it was. Very broad. And you asked for this. We asked for, because there was issues, because there was hundreds of thousands of dollars at issue, and we suspected just as Teardrop did. And future potential obligation, right? Exactly. Right. And we wanted a decision on that because. And there still is, if you don't get a decision on that. Not currently, there's not. Okay. There is no obligations that are outstanding right now. But you didn't talk about right now. You talked about potentially future obligations if you did not get a decision on that issue. We talked about successive payments, which at that time, there were successive payments. By the time Teardrop even filed its lawsuit, there were successive payments. Successive and future payments. Yes, Your Honor. Yeah. So one technical procedural point I just want to make sure I'm clear about, because you're here arguing that the counterclaim should go away. I assume that you couldn't, Devin couldn't simply dismiss the counterclaim under Rule 41A. That's why it's still there. Is that right? If too much time had passed, then we weren't going to get consent from Teardrop to do so. And we have authority that says that you're stuck with, unless it's moved. Right. Okay. The next issue before the Court today is the interpretation of the agreements and whether the Peneco cases, two Wyoming Supreme Court cases, would hold that Devin remained liable after it assigned those to Carvin, Creek, and Moran. And I want to emphasize this. We're not asking this Court to overturn Peneco. We don't think Peneco was wrongly decided. I'm sorry to interrupt, but it's just a threshold leading into your argument. Why should we review the summary judgment on the summary judgment order on Teardrop's claims when the parties in the district court have all said the claim's removed? Because it's that decision, if you read the decision on our counterclaims. I have. It's that first decision that was the entire basis of that second decision. And so it's the same rationale from the first decision. And so whether you're reviewing the second or the first, it's the same question, threshold question. Same question, but I mean, but are we reviewing that order? I don't necessarily think the Court has to review that order. I think the Court could simply review the second question. Yeah, because it's the same Peneco analysis that goes into it. And to my point, we're not asking for Peneco to be overruled or changed. We're simply asking for it to be applied as it was written. And that's under Wyoming's well-established rules for contract interpretation, which seek to both ascertain and imply the intent of the parties, based primarily on the contract language. And the issue is whether or not in these agreements, the parties intended to create obligations that are connected to Devon and would stay with Devon after assignment, or were obligations connected to the use of the land and would therefore pass with the assignment. This is necessarily a case-by-case and agreement-by-agreement determination. And we're asking the Court to apply it that way. The problem in this case can be seen how teardrop characterizes the Peneco decisions. They characterize them as policy decisions. As what, I'm sorry? As policy decisions. Oh. Where the Wyoming Supreme Court was faced with a situation where landowners like teardrop had defunct or bankrupt operators and were thus stuck with oil and gas facilities all over their land that they were promised would be cleaned up. And so the Wyoming Supreme Court said, we are going to make a new categorical rule where we interpret these kinds of oil and gas agreements differently than any other agreement and assigning operators automatically remain liable. That's not what the Court said in Peneco. What the Court did in Peneco was apply the same rules it applies in any contract interpretation to determine the intent of the parties. And frankly, I don't think it would be appropriate for the Wyoming Supreme Court to come up with such a policy decision because that would be the purview of the legislature. And if the Supreme Court in Wyoming was going to do that in the Peneco cases, they certainly would have said so. And they didn't. Counselor, can you help me understand this though? Because teardrop wasn't a party to this assignment. And so as I recall, the district court found that the agreement was not ambiguous as to liability after assignment. And then as I also understand it, there was no written ovation afterwards. So is your argument just that by teardrop going directly to the assignees for payment and dealing with them, essentially acknowledging that your client was cut out, that that's enough then to transfer not just Devin's rights under the contract, but their obligations as well? Right. Well, there's a lot to unpack in that question. There is. I agree. So there's two separate issues here. And they have two separate timelines that you have to keep in mind. Peneco is about the intent in the agreements and whether or not surely the assignment would discharge Devin from its obligations. That's based on interpreting the contracts. And that's based on the moment they were assigned. The second question is novation. Novation is based upon after that. And it presumes that Devin was not released at the moment of assignment based on the intent of the parties. That question is then based on everything that happened in the years after that. And yes, we do not have an express written novation in this case. But the law is clear that novation, like other agreements, can be implied and based upon the conduct of the parties. And so what we're arguing, particularly at this stage, is that summary judgment was inappropriate on novation because those years of conduct and teardrop working with Moriah and Carbon Creek created a question of fact as to whether or not there was the intent to discharge Devin through the substitution and replacement with Carbon Creek and Moriah. What was the evidence that showed a clear manifestation of assent? Clear manifestation of assent. Right. To release the client. So I think an important distinction to make is our burden at trial is to show a clear intent to do that. Our burden of summary judgment is to provide sufficient evidence that a jury could find that at trial based on weighing the evidence. You've got to have something. Right. And our evidence in this case is the years of working with Moriah and all with the complete absence of Devin. What case law did you have to show that from a novation standpoint, just assenting to their payment somehow releases the actual contracting party from their obligations? Well, we aren't making the argument that simply accepting payment is not enough. And I would agree with that. What else do you have? What we have is the fact that it's not just accepting performance. It's that when performance was deficient, Teardrop looked to Carbon Creek and Moriah to fix it. And it wasn't just that they looked for them to fix it. It's not an issue of, hey, you were supposed to reclaim this. You didn't do a good job. Come back out. Well, of course they would look to them first. I mean, why wouldn't they do that until they couldn't pay or they couldn't fix it. And then they look to the obligor. Well, it's certainly evidence that could be interpreted in the light most favorable to Devin that they believe that that's because that obligation was Carbon Creek and Moriah's and only theirs. Any case law to support that? Yeah, I believe the Gulf Coast Gulf Oil case that we cited, it talks about this is very analogous. The case of Lewis in Wyoming talks about innovation, talks about implied innovation of looking at the conduct of the parties. But don't we only analyze that type of evidence if we don't find the answer by first looking within the four corners of the document itself? No, but again, that's the separate question between whether or not the contract itself would discharge Devin after an assignment and whether or not innovation. So if we conclude that the contract itself does not discharge Devin and the rest of this is irrelevant? No, it would be the opposite. If the contract concludes that the assignment would discharge Devin, then innovation becomes irrelevant because we wouldn't need innovation. If the contract assumes and has the intent that Devin would not be discharged, then innovation comes in to see whether or not Devin was discharged, regardless of what the intent of the contract was. And I see I'm running out of time. There is... On the Penteco decision, which you started to talk about, you seem to be suggesting that the district court didn't really consider it as a factual issue. And I think, you know, there's some reason to believe that Penteco II made it black-letter law, and this just simply doesn't pass muster. But district court did an alternative approach. It said, all right, if it's black-letter, here's my answer. And my answer is the same if you look at the various factors that were set out in Penteco I and discussed again in slightly different form in Penteco II. It looked at it both ways. It did, but I don't believe it applied it correctly. In contract interpretation, you're supposed to apply the language to arrive at the intent. And I agree that Penteco II was a shorter analysis, but that makes sense because Penteco I was a question of first interpretation. I see I'm out of time, if you don't mind. Penteco I was the first time that the court had to address this question. And so what it did was it went through a detailed analysis. It said, these are the kind of obligations that stay with the assigning party. These are the kind of obligations that don't. It said, this is how we're going to figure it out. We're going to compare different obligations from different other contracts. Then it had to say, OK, so this is what we think is important. It went and applied that to several different agreements with multiple parties. And then it recapped and said, here are all the factors that we're looking at. And then it also had interveners and amicus briefs that it had to address their arguments of. That's a lot of analysis. Penteco II didn't hardly have any of that. And Penteco II already had Penteco I saying, this is the important factors. This is what we're going to look at. And it did. And Penteco II reiterated that we're doing this on a case-by-case, contract-by-contract interpretation. And it primarily relied on the connection between reclamation and annual payments. And again, we've highlighted this extensively in our brief here. It's about use. And I do, and I apologize for going on, but I do like to make one point on the point of use, is the court in Penteco talked about the connection between annual payments and reclamation to support that obligation. It specifically said that connecting the obligation to use would show a servitude. That's exactly what the Surface Use Agreement does here. And it's important to note that the Surface Use Agreement has two different payment provisions for the construction of well sites and using this land. The first is initial payment, $1,900, if you want to build a well site. The second is an annual payment for the continued use. And unlike in Penteco, where that annual payment was specifically for damages, the it's that initial payment that is paying for the right for that building to be there, for those facilities to be there. That's the damages payment. That's the one-time payment. The annual payment in Section 5 is expressly about use. That connects to the operator that's currently working on it. Thank you. Thank you, counsel. May it please the court. My name is Tom Toner. I represent Teardrop Cattle Company. My law firm represented both of the ranchers in the Penteco cases. You know, our ranchers in the Powder River Basin were faced with the plague of these major oil companies abandoning the wells to these startup companies that were financially irresponsible and then leaving the country with all these wells and not paying for them. So we brought a number of lawsuits beginning in 2011 against these major oil companies. And we thought we finally got it resolved in the Penteco cases, which were decided in December of 2015 and March of 2016 when the Wyoming Supreme Court said if you have a surface damage agreement relating to the production of oil and gas on Wyoming land, you do not extate liability on that contract by assigning it to somebody else. You have to either have an exculpatory clause that says upon assignment you're released or the landowner has to release you. Well, we thought that sort of resolved it. Am I right that your argument is there is no exculpatory clause here and the contract's not ambiguous to that point? That's exactly right. There's no exculpatory clause. These contracts are not ambiguous. They're either a contract or they're a subvertude. They're one or the other. And you look just at the paper. There's no argument about what Devon intended or didn't intend. As the court said in Penteco, we don't know what secret intentions Devon had. We look at the four corners of the document. And there's certainly nothing in the record to indicate that Teardrop released Devon? No. No, the testimony is absolutely to the contrary. Devon's prime man on this, Brian Carlson, testified they never negotiated with Teardrop for a release. They never told Teardrop that they were no longer obligated after they assigned it. They never repudiated the contract. Teardrop never signed a contract with Carbon Creek or Mariah. And when they asked us to amend the agreements to cut them some slack while they were making some payments, Teardrop refused to do it because we knew what would happen. If we ever changed the contracts in the least bit, we'd be faced with an innovation argument. And so that's what happened. So what happened here is the reason those dates of the decisions of Penteco are so important is because Devon, when they entered into the contract with Mariah, they testified they knew about both of the Penteco cases. They knew they were there. And so here they were. They were losing $6 million a year. They had to unload this money-losing asset. They knew about the Penteco cases. They knew that there weren't exculpatory clauses in any of their provisions, in any of the contracts. None of them had that. So they decided they were going to give what they did. They gave the assets away, hundreds of wells, all this equipment for $0, plus they agreed to pay them $7 million to take these wells and plumb them. So that's the factual situation we're dealing with here. Now, in our brief in the Penteco cases, we referred to some authority that certainly says the, or announces the principle more clearly than I ever could. It came from a professor, Charles Knapp at the New York University. He wrote a book called Problems in Contract Law in 1976. And he talked about assigning rights and delegating duties. And I would never have thought of this, but here's what he said. He said, if assigning a right is like passing a football, then delegating a duty resembles more the dissemination of a catchy tune or a communicable disease. Passing it along is not the same as getting rid of it. And Devon knew that when they entered into the contract with Marriott. They knew they couldn't pass it along. So what they did, knowing that they didn't have an exculpatory clause in their contracts, they were making a big bet. They were betting that this company that was just formed, couldn't provide any financial statements or financial assurances, was going to be able to make the payments to Teardrop, and they wouldn't have to worry about it. Well, they lost that bet, but now they're calling on Teardrop to pay their losses. But of course, Devon, I get these companies mixed up sometimes. Devon is a shrewd company. They're a major oil company. So they hedged their bets. And in their contract that they signed with Marriott, they didn't give all the rights that they had under the Teardrop agreements away. They kept some. They reserved the right that if Marriott defaulted on Teardrop's payment, they reserved the right to come in and make the payment. If Marriott didn't reclaim Teardrop's property, Devon reserved the right in their contract to come on to the Teardrop branch and do the reclamation. And just like in the Penteco cases, exactly the same, they reserved the so-called deep rights in the Teardrop lands and in the leases. And they reserved the right to come on, just like in Penteco, the Teardrop lands to produce their deep rights. And not only that, that contract says if the coal bed methane wells that they had passed on to Marriott Carbon Creek were producing and holding the deep rights under the terms of the oil and gas lease, and if Marriott Carbon Creek wanted to plug that well, they reserved the right to take it back in order to protect their deep rights. So they didn't even give away all of their rights under this contract. They actually kept rights to use the Teardrop land, just like in Penteco. Now, you might wonder why I'm here since we got paid. It's a pretty obvious question. It's because of that extremely broad counterclaim that they asserted against us. They wanted a declaration that the contracts were canceled and terminated, that they were not responsible for any future liabilities or breaches, and they were precluded from ever suing them again for anything. Non-payment, reclamation, nothing. We were out. Now, once we won the summary judgment on the complaint, where they were defending saying, oh, well, these are still servitudes, they're not contracts, or there isn't some kind of innovation, they still had this position. Their position was stated very clearly. Their head man, again, he said, I asked him this question on his deposition. He said, this is found in the volume two, page 241. Now, you've mentioned making a full and complete assignment several times. Is it your understanding that Devon was automatically released from its obligations to Teardrop when it made the assignment to Mariah or Carmen Creek? Yes. Yes. The stroke of the pen, they're gone. That was their position. They were claiming these are servitudes. Well, counsel, could we get focused in a little bit more on this mootness? On mootness? Yeah. Yes, oh, sure. Right. So we have the counterclaim, and you would prefer it not to be moot, and they would prefer it to be moot. So why isn't it moot? It's not moot. I mean, you've been paid. What's there to be decided at this point that will have real world impact, and why haven't they shown that this is moot? Let me start with one of the questions you were asking, and you were just told that, well, they've been paid since. You know who's paying us? Devon. You don't think this is going to have real world consequence, that counterclaim? If that counterclaim had been granted, do you think we'd get paid a dime after that? They would have gone back to Oklahoma. Because I might, they say, well, this company that's still in bankruptcy after five years, maybe they'll pay you in the future. If you look at the appendix, volume five, at page 68 through 73, let me tell you what they wrote about this company that might pay us in the future. It says, throughout the course of this bankruptcy, the debtor has taken actions to the detriment of creditors in the estate, including transferring significant amounts of money on a monthly basis to the debtor's affiliates, PM and CR. That's Potter River, Midstream, and Carbon Creek. With no supervision over how those funds were spent, the transactions coupled with the enormous amount of unpaid, post-petition obligations of the debtor raise serious questions concerning the debtor's management of its resources and the property of the bankruptcy estate. Now, that's a pretty real world consequence. This bankruptcy entity is a walking dead entity. It really is. And there's no way we're going to- Let me back up. I really want to get to the standard for mootness. And the question is, at least at this point, is there any outstanding payment to your client at this point? Not today, because Devin just paid us this month, right before this argument. Okay. And to the extent that the assignees, Mariah, for example, that they didn't pay, it's Devin who's been paying for them? Is that what you're telling us? Devin's been paying for Devin. It's their obligation. Well, I understand that. I understand that. But if this were to repeat, if history repeats itself, how does it play out? Do the assignees not pay, and then you ask to be paid, and then maybe Devin pays? And how likely is that to happen? Because if it's likely, that's a better argument that it's not moot. But if all we're talking is speculation, then maybe not. So why is this still a live issue? It's still a live issue because if there is a decision that these are servitudes, which they've asked you to decide, in this case, they've argued that they're servitudes, they're going to go back to Oklahoma, and they're never going to pay us again. You know, what's going on right now is the payment comes due. We send them a notice of default. Mariah Carbon Creek does not pay. And eventually, Devin pays. Now, that may or may not continue. It's highly unlikely that it will continue if their arguments in this case succeed, is that it's a servitude or it's a novation. And that's what their position is. So it can't be moot. This case has to be decided because if it isn't, they're not going to pay anymore. Why would they? Well, but then you can sue them. But then you can sue them, and then you resurrect that dispute. Then we start over. Right? I mean, ranchers don't have unlimited access to attorney fees. Some of these contracts don't have attorney fee provisions. And if Devin just says, well, sue us, what's the worst that can happen? We'll have to pay you what we owe you, or maybe not, or maybe because of our economic power, you'll give up. And that happens, because sometimes the ranchers just can't afford to do it. Counselor, can I ask you about the one issue that was raised that we haven't discussed today? And that's the Wyoming Split Estate Act. And as I understand Devin's argument, they're saying, well, we're not actually an oil and gas producer anymore because we're just not in that business. So therefore, we're not liable under this act. I think I know your answer to this, but I'd like to invite you to tell me why they're wrong. Well, because their argument makes no sense. If you're contractually obligated to make the payment, and the Wyoming legislature passed a law specifically to be sure that the landowner gets paid and the oil companies don't get to keep somebody else's money as a remedial statute, they're saying, yes, we're liable for the payment. But if we decide not to pay you, we can defeat the purpose of the legislature and claim that we're not currently operating. And the question is, were they engaged? Now, Judge, if you want to look at the district court decisions, and I understand you guys give it due regard, since it hasn't been decided by the Wyoming Supreme Court, what if our district courts held every time, and the same law firm that represents Devon here has lost this argument at least four times against our firm in other cases when they were representing a company called Atadarko. The courts have said, if you're contractually liable for it, and you've got the contractual liability, that is necessarily linked to the statutory liability. Otherwise, it makes no sense. And the other point I would make on that is, remember, they reserve the deep rights. They still have the operating rights under teardrop land, and they have the right to take over a coal bed methane well on teardrop land right now, today, if they thought they had to do it in order to protect their deep rights. I have a slightly different but related question on the Split Estate Act double damages. If the parties have agreed that teardrops claims in this case are moot, why isn't that issue moot? Well, I guess the whole case would be moot then. They're complaining about the... Well, no, we're talking about if there's going to be any split or double damage payment, it would be on your claims. Yes. And they've been paid, and both sides say they're gone. Those claims are gone. They're moot. Why should this Split Estate Act even apply at this point? We don't have anything to apply it to. Well, no, but they've asked for a ruling from this court that says they are not responsible because they're not a court current operator. They're asking for it. And I understand that that was the colloquy leading up to my question, but my question is whether this gets off the ground at all because your claims are moot. Well, of course, I don't think the claims are moot. No, you agree that those claims were moot. You don't agree that the counterclaims moot, but Teardrop's initial claims have been mooted. They've been paid. Both sides agreed they're moot. So where do we... How do we even reach the double damages issue? It's fine with me if you don't want to reach that issue. I mean, they raised it as an issue in the case. I had to respond to it. I agree with you. Well, it's okay with your client. I absolutely agree. But weren't you seeking the double damages? Yes. Okay, are you conceding that issue today because it's moot? I'm not conceding the issue. I'm saying they're still liable. If this issue ever comes up again... If it comes up again, I'm just talking about the part of the case that isn't part of the case anymore. That's right. It would not be part of the case, but for the fact they've listed it as an issue on appeal and I had to respond to it. I'm comfortable that we go back into Wyoming court... Okay, let me just back up and put it this way. Does Devin owe you any payments at this point on the Wyoming Split Estate Act? No. All right. I do not. That's helpful. And they didn't ask for this particular ruling in terms of any future obligations. They were relating it to your claim in this particular... Yes. That makes this claim moot, essentially. Yes, it would, but it's nonetheless... I see your point. You responded... No, I understand. You were responding to a brief. Right. Okay, thank you. I think I'm way off. I'm sorry. Thank you. Thanks to both of you. Appreciate the arguments this afternoon and the case is submitted and counselor excused.